# In the United States Court of Federal Claims

No. 17-1926 VV

(Filed Under Seal: September 16, 2025)[*]

(Reissued: October 1, 2025)

```
* * * * * * * * * * * * * * * * * *
                                   *
AMANDA TRIPP,                      *
                                   *
                  Petitioner,      *
                                   *
     v.                            *
                                   *
SECRETARY OF HEALTH                *
AND HUMAN SERVICES,                *
                                   *
                  Respondent.      *
                                   *
* * * * * * * * * * * * * * * * * *
```

*Verne E. Paradie, Jr.*, Paradie, Rabasco & Seasonwein, of Lewiston, ME, for Petitioner.

*Madelyn E. Weeks*, Trial Attorney, with whom were *Heather L. Pearlman*, Deputy Director, *C. Salvatore D'Alessio*, Director, and *Yaakov M. Roth*, Acting Assistant Attorney General, Torts Branch, Civil Division, U.S. Department of Justice, all of Washington, D.C., for Respondent.

## OPINION AND ORDER

**SOMERS**, Judge.

Petitioner Amanda Tripp filed a motion for review, ECF No. 105, challenging Special Master Horner's denial of entitlement to compensation under the National Childhood Vaccine Injury Act ("the Vaccine Act"), 42 U.S.C. § 300aa-10, et seq. (2012), for injuries that she alleged were caused by an influenza ("flu") vaccination, *Tripp v. Sec'y of Health & Hum. Servs.*, No. 17-1926V, 2025 WL 1158861 (Fed. Cl. Spec. Mstr. Mar. 21, 2025). Before the special master, Petitioner asserted the theory that the flu vaccination caused her to develop post-vaccination cerebellitis. *See Tripp*, 2025 WL 1158861, at *1. A form of encephalitis or an inflammatory condition affecting the brain, cerebellitis is not recognized under the Vaccine Act as an injury

---

[*] On September 16, 2025, the Court issued this opinion and order under seal in accordance with Rule 18(b) of the Vaccine Rules (Appendix B) of the Rules of the U.S. Court of Federal Claims. The Court provided the parties 14 days to propose redactions. The parties did not propose any redactions; accordingly, the Court reissues this opinion in its original form with a few minor stylistic and typographical corrections.

that can be "caused-in-fact" by the flu vaccination; however, Petitioner may still receive compensation if, among other things, she proves causation using the tripartite test established in *Althen v. Secretary of Health & Human Services*, 418 F.3d 1274 (Fed. Cir. 2005). *See Tripp*, 2025 WL 1158861, at *8, *1. In her motion, Petitioner sought review of Special Master Horner's conclusion that she did not meet her burden of proof, in that she fell short of making out the preponderant showing for all three of the required *Althen* prongs. ECF No. 105 at 1. Petitioner asserts that, given the evidence before the special master, his conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 12. Specifically, Petitioner alleges that the special master "disregarded the conclusions of multiple treating physicians and specialists," and thus his findings must be set aside. *Id.* at 8. Petitioner further requests that the Court "issue its own findings of fact and conclusions of law, or remand the Petition to the Special Master for further action . . . ." *Id.* at 12.

As discussed below, the Court denies Petitioner's motion for review. Petitioner's motion amounts to a request for the Court to reweigh the evidence that the special master had before him and return a different conclusion based solely on the fact that a different conclusion is plausible. However, the Court cannot disturb the special master's conclusions short of Petitioner making the requisite showing that the special master's conclusions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Just as Petitioner could not make out a preponderant showing before the special master, she again falls short of meeting her burden here. Petitioner has failed to demonstrate that the special master's decision to deny entitlement—on the bases that there was neither a sound and reliable theory of causation nor a logical sequence of cause and effect that could implicate the flu vaccine as a cause of Petitioner's diagnosis—was irrational.

## BACKGROUND

**A.     Factual History**

This case arises from a flu vaccine Petitioner received from her primary care physician at her annual physical on March 21, 2016. ECF No. 1 ¶ 2; ECF No. 1-3 at 23–27. Petitioner attended the routine appointment, and her physical examination was normal. ECF No. 1-3 at 24. Notably, Petitioner told her physician that her "estranged mother . . . died 2 weeks ago," so Petitioner was in a "[v]ery stressful" and "complicated" place. *Id.* at 27. Her physician noted that Petitioner had a history of, *inter alia*, cough, reflux, migraine, snoring, an anxiety disorder, and bipolar affective disorder. *Id.* at 26. During the visit, her physician administered a routine flu vaccine, *id.* at 24, which Petitioner believes eventually led to "[a]taxia, speech issues, cerebritis and related neurological symptoms" she alleges are symptoms of post-vaccination brain swelling characterized as either cerebellitis or encephalitis, ECF No. 1 ¶¶ 26, 8.

Two days after the vaccination, on March 23, 2016, Petitioner went to the hospital emergency department experiencing fever, nausea, vomiting, diarrhea, and headache. *See* ECF No. 21-1 at 2 ("She presents today with continued [sic] until yesterday when her vomitng [sic] and diarrhea resolved."); ECF No. 14-1 at 42 ("She was having some nauseousness and vomiting diarrhea [sic] but that has subsided."). Although her symptoms subsided within a day, Petitioner returned to the emergency department five days later presenting with dizziness, slurred and

slowed speech, and an unsteady gait. ECF No. 14-1 at 44; ECF No. 1 ¶ 5. Over the eight days between March 23 and March 30, 2016, Petitioner returned to the hospital six different times seeking treatment for an evolving panoply of symptoms. *See, e.g.*, ECF No. 21-1 at 19–24 (March 23, 2016, visiting the emergency department for vomiting, nausea, fever, headache, and diarrhea); *id.* at 2–6 (March 28, 2016, visiting the same emergency department for nausea, headache, "nonspecific dizziness and increased anxiety"); ECF No. 14-1 at 42–45 (March 29, 2016, visiting a different emergency department for a "second opinion," complaining of a slight headache and slurred speech); ECF No. 1-3 at 30 (March 30, 2016, returning to her primary care physician with headaches, poor balance, dizziness, and issues with spatial awareness, limited walking capabilities, and slurred speech); ECF No. 14-1 at 29–36 (March 30, 2016, returning to the March 29 emergency department with headache, photophobia, pain in her right thumb, slurred speech, unsteadiness, rash, and bruising); *id.* at 18–28, 40–46 (March 31, 2016, admission to the same emergency department for testing and neurology consultation). On March 31, 2016, Petitioner returned to the emergency department in a wheelchair and was admitted to the hospital for multiple days, where she underwent extensive testing, completed various neurological and psychiatric consultations, and began a five-day course of intravenous immunoglobulin, which led to some improvement in her walking abilities. *See* ECF No. 14-1 at 25–26, 8–9; ECF No. 1-2 at 116–17, 7–9. Repeated testing throughout this period—multiple physical and neurological examinations, blood work, urine toxicology, CT scans, MRIs of her brain and abdomen, and extensive infectious disease testing—rendered largely unremarkable results. *See* ECF No. 21-1 at 23–25, 6–7; ECF No. 1-3 at 29; ECF No. 14-1 at 17–18; ECF No. 1-2 at 116, 7–9; ECF No. 5-1 at 82. *But see* ECF No. 21-1 at 24 (blood work showing slightly elevated neutrophils and low lymphocytes on March 23); ECF No. 14-1 at 18 (cerebrospinal fluid analysis showing abnormalities with "mild lymphocytic pleocytosis" on March 31).

Petitioner's treating physicians each noted their differential diagnoses, which included an unspecified "viral syndrome," ECF No. 21-1 at 25 (at her first emergency department visit, presenting with vomiting and diarrhea), "stress and mental illness," *id.* at 6 (at her second emergency department visit), and a possible "stress reaction," ECF No. 14-1 at 42 (at her third emergency department visit). Multiple treating physicians remarked that Petitioner's symptoms were unlikely to have been caused by infections and specifically excluded encephalitis as a diagnosis based on her symptoms. *See, e.g.*, ECF No. 21-1 at 6 ("It is unlikely her symptoms are due to [central nervous system] infection (meningitis, encephalitis) . . . ."); ECF No. 14-1 at 45 ("Differential includes encephalitis and meningitis which I think is unlikely without meningeal signs fevers headache or neck pain today."). Although one treating physician wrote that his initial impression was that her slurred and delayed speech could have been caused by "viral prodrome after flu vaccine," it was one possibility among a differential diagnosis that included multiple sclerosis and acute disseminated encephalomyelitis. ECF No. 14-1 at 25–26, 30. During one visit, Petitioner was treated for infectious causes of her symptoms, including treating her empirically for encephalitis, alongside Lyme disease and other possible bacterial infections. *Id.* at 18. Despite treating Petitioner for encephalitis based on an empirical diagnosis given her abnormal cerebrospinal fluid, the physician remarked that this was "not at all a classic presentation for . . . encephalitis." *Id.* Moreover, Petitioner was specifically tested for viral encephalitis, and the panel came back negative. ECF No. 1-2 at 48.

3

Following her initial multi-day admission, Petitioner was transferred to Massachusetts General Hospital for further testing, as well as occupational, speech, and physical therapies. *See, e.g.*, ECF No. 5-1 at 28, 81, 85. She displayed severely diminished functioning capacity with poor coordination and balance, as well as difficulty communicating. *Id.* at 81. Further examination and testing led her treating physicians to conclude that her symptoms were "inconsistent with motor speech disturbance and not entirely consistent with a cerebellar or dysarthria syndrome," and they would likely improve with continued physical therapy. *Id.* at 81–82. Following a five-day course of a corticosteroid to reduce inflammation, Petitioner showed signs of improvement and was discharged with improved speech patterns and a referral for inpatient rehabilitation. *Id.* at 25. In those discharge notes, the physician noted that extensive workup was "unremarkable" but that some neuroradiology imaging might be consistent with "post-vaccination cerebellitis," which her team of physicians were treating as a "working diagnosis." *Id.* at 26. Petitioner relayed this diagnosis to her inpatient rehabilitation hospital, where it was echoed in her charts. ECF No. 6-1 at 5 ("Discharge Diagnoses: 1. Cerebellitis, 2. Difficulty walking").

After a month of rehabilitation, Petitioner returned to the first emergency department for a follow-up appointment, reporting improvement but continued difficulty walking and speaking, as well as high anxiety. ECF No. 1-3 at 35. One month after that, she visited a rehabilitation specialist, who noted further improvement in Petitioner's gait and speech and echoed her previous diagnosis. ECF No. 6-3 at 2 ("[S]he comes to clinic with the diagnosis of post vaccination cerebritis."). Petitioner also underwent four months of psychotherapy to help cope with the loss of her mother, and her therapist reported that her mood was stable and that she was more alert and interactive. ECF No. 6-4 at 19. Nearly one year later, Petitioner returned to her primary care physician reporting persistent headaches and depression. ECF No. 25-2 at 2. Petitioner stated that she had received a glaucoma diagnosis, which Petitioner suspected was "due to the cerebellitis she suffered last year." *Id.*

B.  **Procedural History**

Petitioner brought suit in December 2017, seeking compensation for post-vaccination cerebellar syndrome, which she argues was caused by the flu vaccine. ECF No. 1 ¶ 26. Respondent opposed compensation because Petitioner failed to both establish the flu vaccine as the "cause-in-fact" for Petitioner's diagnosis and produce sufficient evidence of a cognizable injury. ECF No. 24 at 17–21. Petitioner filed medical records, an affidavit, and expert reports. ECF No. 1; ECF No. 5; ECF No. 6; ECF No. 11; ECF No. 14; ECF No. 21; ECF No. 42; ECF No. 61. Respondent filed responsive expert reports. ECF No. 52; ECF No. 53; ECF No. 66. Special Master Horner held a two-day entitlement hearing and, after a replete review of the evidence, issued a decision dismissing Petitioner's case. *See Tripp*, 2025 WL 1158861, at *3. Special Master Horner made note of the profound impact these injuries have had on Petitioner's life as well as the sympathy that he has for her, but he ultimately found that, as required under *Althen*, Petitioner had not made out the requisite showing of causation—that she had failed to put forth "preponderant evidence supporting a sound and reliable theory of causation that would implicate the flu vaccine as a cause of cerebellitis" and "preponderant evidence supporting a logical sequence of cause and effect implicating petitioner's flu vaccine as a cause of cerebellitis." *Tripp*, 2025 WL 1158861, at *18, *21.

4

Petitioner subsequently filed a motion for review of the special master's decision. ECF No. 105. In her motion, Petitioner "object[ed] to the Special Master's conclusion that she did not meet her burden of proof as set forth in *Althen*." *Id.* at 1 (emphasis omitted). She challenged the special master's findings with respect to all three *Althen* prongs. For the first prong, she asserted that she had offered sufficient evidence to prove, based on a "plausible medical theory," that her cerebellitis was caused by the flu vaccine. *Id.* at 6–9. Petitioner states that "the Special Master disregarded the conclusions of multiple treating physicians and specialists at the very well respected Massachusetts General Hospital," who "must believe that cerebellitis can be caused by the influenza vaccination, since that is the diagnosis they chose to provide." *Id.* at 8. Next, Petitioner challenged the special master's conclusion that she had not met the second *Althen* prong because she presented expert testimony that "the vaccination was the most plausible explanation" for Petitioner's illness. *Id.* at 9. Petitioner argues that she presented sufficient evidence to overcome a lack of definitive diagnosis for post-vaccinal cerebellitis. *Id.* at 10–11. Finally, Petitioner states that "[a]ll of her treating physicians believed there to be a close enough temporal relationship to the vaccination and the onset of her neurological symptoms to diagnose her with post-vaccinal cerebellitis," and thus she met her burden on the third *Althen* prong. *Id.* at 12. Plaintiff seems to argue that, given the evidence before the special master, any decision other than granting entitlement to compensation must be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.*

Respondent opposes Petitioner's motion. ECF No. 107. Respondent asserts that the first *Althen* prong requires proof by preponderant evidence, not merely plausibility, which Petitioner failed to provide, *id.* at 7–9; that the special master properly weighed the opinions of the experts and medical records before him and properly found that the second prong was not met, *id.* at 10–11; and that there was an untenable temporal relationship between administration of the vaccine and the alleged immune response to show causation, *id.* at 11–12. Following briefing, the Court held oral argument on Petitioner's motion on July 16, 2025.

## DISCUSSION

### A. Legal Standard

The Vaccine Act affords litigants the ability to seek compensation for injuries caused by the administration of a vaccine. *See* 42 U.S.C. § 300aa-10, *et seq.* While the Act is a "pro-claimant regime meant to allow injured individuals a fair and fast path to compensation," *K.G. v. Sec'y of Health & Hum. Servs.*, 951 F.3d 1374, 1380 (Fed. Cir. 2020), the Act nonetheless mandates that claimants prove that the vaccine caused the injury alleged. *Althen*, 418 F.3d at 1278. A claimant may meet this burden either by proving that he or she suffered an injury associated with a specific vaccine within a given timeframe, as described in 42 U.S.C. § 300aa-14(a), known as a "Table injury," or prove causation-in-fact, known as an "off-Table injury." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1351 (Fed. Cir. 2008).

When a claimant's injury is off-Table, the claimant is not afforded any presumption of causation and bears the burden of proving that the vaccine is a "substantial factor in bringing about the alleged harm." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 431(a)); *Shyface v.*

5

*Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352 (Fed. Cir. 1999). This burden offers claimants latitude to "allow the finding of causation in a field bereft of complete and direct proof of how vaccines affect the human body." *Althen*, 418 F.3d at 1280. As applied to off-Table injuries, the Federal Circuit has held that a claimant may meet his or her burden by proving with preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* at 1278. If a claimant makes a prima facie showing of each of the three requirements, known as the "*Althen* prongs," he or she is entitled to compensation unless the respondent shows "also by a preponderance of evidence, that the injury was in fact caused by factors unrelated to the vaccine." *Whitecotton v. Sec'y of Health & Hum. Servs.*, 17 F.3d 374, 376 (Fed. Cir. 1994), *rev'd on other grounds sub nom.*, *Shalala v. Whitecotton*, 514 U.S. 268 (1995). If a claimant fails to make out any one of the three prongs by preponderant evidence, the special master cannot find the vaccination to have been the cause-in fact of the injuries alleged under *Althen*. *See Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1355 (Fed. Cir. 2019).

Following a special master's issuance of a decision to deny or grant a petitioner entitlement to compensation, either party may file a motion for review by this Court. 42 U.S.C. § 300aa-12(e). Upon receipt of the filing, the Court has jurisdiction to review the proceedings and may uphold the findings of fact and conclusions of law; set aside findings of fact or conclusions of law if they are found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact or conclusions of law; or remand to the special master for further proceedings. *Id.* § 300aa-12(e)(2)(A)–(C).

The Court does not disturb a special master's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 300aa-12(e); *Markovich v. Sec'y of Health & Hum. Servs.*, 477 F.3d 1353, 1355–56 (Fed. Cir. 2007). The Federal Circuit has further defined how this standard applies:

> These standards vary in application as well as degree of deference. Each standard applies to a different aspect of the judgment. Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the "not in accordance with law" standard; and discretionary rulings under the abuse of discretion standard. The latter will rarely come into play except where the special master excludes evidence.

*Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992).

The Court's standard of review in these cases is "uniquely deferential." *Milik v. Sec'y of Health & Hum. Servs.*, 822 F.3d 1367, 1376 (Fed. Cir. 2016) (quoting *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993)). The Court does not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011). So long as the special master's conclusions are "based on evidence in the record that was not wholly implausible," the Court is "compelled to uphold that finding as not

being arbitrary or capricious." *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1363 (Fed. Cir. 2000). In other words, the Court is tasked with simply determining "whether the special master examined the 'relevant data' and articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Dixon v. Sec'y of Health & Hum. Servs.*, 61 Fed. Cl. 1, 8 (2004) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

**B.     Analysis**

Applying the above-discussed standard of review of a special master's decision, there is no doubt that Petitioner failed to demonstrate that the special master's decision was arbitrary, capricious, or otherwise not in accordance with the law. In challenging the special master's conclusions, Petitioner has failed to meet all three *Althen* prongs. The Court will address each in turn.

      **1.     *Althen* Prong One**

The first *Althen* prong requires a petitioner to prove by preponderant evidence that a medical theory causally connects the vaccination to the injury. 418 F.3d at 1278. While the medical theory need not "rise to the level of scientific certainty" and a petitioner need not provide "detailed medical and scientific exposition on the biological mechanisms," a petitioner's medical theory must provide a "reputable medical explanation for the relationship." *Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121, 1120 (Fed. Cir. 2025); *Knudsen ex rel. Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994). In other words, the theory must be more than merely "plausible"; it must be "supported by a sound and reliable medical or scientific explanation." *Knudsen*, 35 F.3d at 548; *see also LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014).

Following a replete examination of the medical literature, case studies, expert reports, testimony, and medical records before him, Special Master Horner concluded that Petitioner had not met her burden of putting forth "a sound and reliable theory of causation that would implicate the flu vaccine as a cause of cerebellitis." *Tripp*, 2025 WL 1158861, at *18. The special master considered but ultimately rejected Petitioner's expert's theory of causation—that antibodies against sodium ion channels could cause cerebellitis—given that the expert was "unable to identify any specific antibody," was "not aware of any literature" supporting this theory, and "characterized this as only a 'plausible' hypothesis" but also stated that it is "still an open research question as to whether or how" the vaccination would cause cerebellitis. *Id.* at *16. The special master reviewed the literature on which Petitioner's and Respondent's experts rely, ultimately finding that the two case reports relied on by Petitioner were "not strong evidence" for the causation at issue in this case. *Id.* at *18. The special master also made note of competing theories of causation before him, in that Petitioner showed signs of a viral infection (i.e., flu-like symptoms) two days after vaccination, but given that the flu vaccine is an inactive vaccine, her immune response may instead have been to a viral infection unrelated to the vaccine or any other neurologic infection. *Id.* at *16, *21. The special master acknowledged that although there was potentially "*some* evidence supportive of a theory of vaccine causation, it [was] not sufficient without more." *Id.* at *16 (emphasis in original).

Petitioner moves this Court to set aside the special master's finding that she failed to meet her burden on the first *Althen* prong on the basis that she offered evidence of a "plausible medical theory causally connecting Petitioner's cerebellitis to the influenza vaccination." ECF No. 105 at 6. She points to both her own expert's testimony as well as Respondent's expert agreeing that the medical literature "provides a feasible hypotheses [sic]" for vaccine-induced immune responses and that the medical literature "**has been able to implicate infections and other vaccines as potential causes**." *Id.* at 7 (emphasis in original).

As the special master noted, Petitioner's evidence that her theory is "feasible" or that the vaccine is one of multiple "potential causes" does not suffice to meet her burden of proof. *Tripp*, 2025 WL 1158861, at *16, *18. The law necessitates more than merely possible theories of causation; rather "the evidence a claimant offers must, in totality, always accomplish one thing in the end: preponderantly establish that the vaccine(s) at issue more likely than not can cause the relevant disease." *Cerrone*, 146 F.4th at 1122 (quoting *Cerrone v. Sec'y of Health & Hum. Servs.*, No. 17-1158V, 2023 WL 3816718 at *26 (Fed. Cl. Spec. Mstr. June 1, 2023) (emphasis omitted)). Petitioner is correct in that she did not need to "prove a specific biological mechanism regarding the vaccination's causation of her injuries." ECF No. 105 at 8; *see Knudsen*, 35 F.3d at 549 ("[C]ausation can be found in vaccine cases based on epidemiological evidence and the clinical picture regarding the particular [petitioner] without detailed medical and scientific exposition on the biological mechanisms."). However, Petitioner wholly misstates the law when she writes: "As the Federal Circuit has repeatedly held, a petitioner need only establish a plausible medical theory, not a theory that has been proven with certainty." ECF No. 105 at 9 (citing to nothing to support this claim). In fact, the Federal Circuit has "*repeatedly* stated that 'simply identifying a "plausible" theory of causation is *insufficient* for a petitioner to meet her burden of proof.'" *Cerrone*, 146 F.4th at 1121 (emphasis added) (quoting *LaLonde*, 746 F.3d at 1339); *see, e.g.*, *Boatmon*, 941 F.3d at 1360 ("We have consistently *rejected* theories that the vaccine only 'likely caused' the injury and reiterated that a 'plausible' or 'possible' causal theory does not satisfy the standard." (emphasis added)); *Moberly ex rel. Moberly*, 592 F.3d 1315, 1322 (Fed Cir. 2010) ("[P]roof of a 'plausible' or 'possible' causal link between the vaccine and the injury . . . is *not* the statutory standard" (emphasis added)); *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) ("[T]he petitioner must do *more* than demonstrate a 'plausible' or 'possible' causal link between the vaccination and the injury; he must prove his case by a preponderance of the evidence." (emphasis added)). Petitioner's burden was less than "a specific biological mechanism" but more than "a 'plausible' theory." The question before the special master was whether Petitioner presented "preponderant evidence supporting a sound and reliable theory of causation." *Tripp*, 2025 WL 1158861, at *18. Based on the special master's thorough review of the evidence and proper application of the law, Petitioner has not shown that the special master's conclusion was erroneous.

At this stage, however, the question before the Court is not whether evidence of Petitioner's specific theory of causation is probable, preponderant, or specific. It is whether Petitioner has demonstrated that the special master's findings and analysis were arbitrary, capricious, or contrary to law. *See Lampe,* 219 F.3d at 1362. Petitioner argues that because she offered "a plausible medical theory," any finding other than that she met her burden is arbitrary, capricious, or contrary to law. ECF No. 105 at 6, 12. Petitioner misunderstands the standard. As

8

noted above, to have prevailed before the special master, plausibility was not enough. The law required preponderant evidence. The ample record before the special master and his detailed examination of that evidence support his finding that Petitioner failed to meet her burden. *See Tripp*, 2025 WL 1158861, at *15–18. Before this Court, plausibility is again not enough. *See Boatmon*, 941 F.3d at 1360. On this point, Petitioner attempts to relitigate her case of plausibility. But because the Court does not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses," the Court must decline the invitation to set aside the special master's finding on the bases provided by Petitioner. *Porter*, 663 F.3d at 1249. As such, Petitioner's argument fails on this point.

Petitioner also argues that the special master's analysis gave insufficient weight to the medical records and expert testimony provided. *See* ECF No. 105 at 7–8. Specifically, according to Petitioner, the special master "disregarded the conclusions of multiple treating physicians and specialists at the very well respected Massachusetts General hospital." *Id.* at 8. She continues:

> The team of multiple qualified physicians[] must believe that cerebellitis can be caused by the influenza vaccination, since that is the diagnosis they chose to provide. One can easily conclude that these physicians either were taught that or learned it from experience. Given the significant weight the Court is to give to medical providers' opinions and conclusions, the Special Master's decision is not in accordance with the law.

*Id.* at 8–9. This argument is flawed for several reasons.

First, what Petitioner refers to as a "conclusion of specialists" and a "diagnosis" was in fact only a "working diagnosis" that a team of treating physicians agreed to use to treat Petitioner based on neuroradiology imaging that only "*may be* . . . consistent with the working diagnosis of a post-vaccination cerebellitis." ECF No. 5-1 at 26 (emphasis added). The treating physician also remarked that with respect to a viral infection there was "[n]o outright convincing evidence clinically," simply stating that there were "suggestive findings of inflammation on [cerebrospinal fluid analysis] . . . as well as some clinical signs . . . ." *Id.*

The special master considered these facts. He found Petitioner's heavy reliance on the Massachusetts General Hospital diagnosis to be problematic for four reasons: (1) the diagnosis was simply a "principal problem" or "working diagnosis" referred to as a "cerebellar disease" that was "merely being questioned"; (2) the factors that led the hospital team to come to this working diagnosis were at odds with what Petitioner's expert would have found helpful in coming to the diagnosis; (3) the hospital team did not know that Petitioner had symptoms of a respiratory infection in the days following vaccination, which would likely have led them to diagnose her symptoms as a post-infection process instead; and (4) the hospital team's conclusion "was otherwise based primarily on a temporal relationship to vaccination, [which] is not sufficient without more." *Tripp*, 2025 WL 1158861, at *19–20; *see Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992) ("[T]emporal association alone does not suffice to show a causal link between the vaccination and the injury. To prove causation in fact,

9

petitioners must show a medical theory causally connecting the vaccination and the injury."). The special master also weighed the working diagnosis against Respondent's expert analysis, which described how the physicians at Massachusetts General Hospital "equivocated between a post-vaccinal or post-infectious etiology" and concluded that "a post-infectious process must be considered more likely than a post-vaccinal process." *Id.* at *20. The special master "articulated a rational basis" and came to his conclusions on this point "based on evidence in the record that was not wholly implausible." *Lampe*, 219 F.3d at 1360, 1363 (first quoting *Hines v. Sec'y of Health & Hum. Servs.*, 940 F.2d 1518, 1528 (Fed Cir. 1991)). As such, the Court is "compelled to uphold that finding as not being arbitrary or capricious." *Id.* at 1363.

Second, Petitioner's argument is circular: because Petitioner was diagnosed with cerebellitis, the flu vaccine can cause cerebellitis. Certainly, as the special master noted, medical records "are generally viewed as particularly trustworthy evidence." *Tripp*, 2025 WL 1158861, at *2 (citing *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993)). However, those views "do not *per se* bind the special master to adopt the conclusion of such an individual, even if they must be considered and carefully evaluated." *Id.* (citing 42 U.S.C. § 300aa-13(b)(1) ("Any such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court."); *Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) ("[T]here is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted.")); *see also* ECF No. 107 at 4–5. The special master considered and weighed the fact of Petitioner's working diagnosis against the other evidence before him, as discussed above. *See supra*. The simple fact of a working diagnosis that was "merely being questioned" does not, unto itself, constitute "a sound and reliable medical or scientific explanation" for Petitioner's theory of causation. *Knudsen*, 35 F.3d at 548. The special master's conclusions cannot be set aside on this basis.

In coming to his conclusion regarding the first *Althen* prong, the special master considered the treating physicians' working diagnosis, the case studies and literature before him, and the conflicting expert testimony and theories proposed by both parties. He articulated a rational basis for why he could not "conclude that there is preponderant evidence supporting a sound and reliable theory of causation that would implicate the flu vaccine as a cause of cerebellitis." *Tripp*, 2025 WL 1158861, at *18. As such, the Court cannot disturb the special master's findings on the bases provided.

For a petitioner to prevail in showing that a non-Table vaccination was the cause-in-fact of his or her injuries, he or she must prove each of the three *Althen* prongs by a preponderance of the evidence. *Althen*, 418 F.3d at 1278. A petitioner's failure to meet his or her burden on any one of the three prongs dictates denial of compensation. *See Henkel v. Sec'y of Health & Hum. Servs.*, No. 23-VV-1894, 2024 WL 3873569, at *1 (Fed. Cir. Aug. 20, 2024) ("Because we conclude that the special master's finding on *Althen* prong three was not arbitrary and capricious (or otherwise erroneous), and because Appellants needed to prevail on all three prongs to have their petition granted, we affirm the petition's denial without reaching the prong-two finding."); *see also W.C.*, 704 F.3d at 1358. As such, the special master did not need to consider the second two *Althen* prongs to have fully "examined the 'relevant data' and articulated a 'satisfactory explanation for its action including a rational connection between the facts found and the choice

10

made.'" *Dixon*, 61 Fed. Cl. at 8 (quoting *State Farm*, 463 U.S. at 43). However, because the special master reached conclusions on the other two *Althen* prongs and because Petitioner moves the Court to review of these conclusions, the Court will review them in turn.

### 2. *Althen* Prong Two

The second *Althen* prong requires a petitioner to prove by preponderant evidence a "reputable—as opposed to merely plausible—medical theory explaining how the vaccine caused the petitioner's injury," *Cerrone*, 146 F.4th at 1121, in the form of a "logical sequence of cause and effect showing that the vaccination was the reason for the injury," *Althen*, 418 F.3d at 1278. Put differently, the medical theory proposed under the first *Althen* prong must be shown to be the mechanism that, in fact, caused the petitioner's injury. *Cerrone*, 146 F.4th at 1121 (citing *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010) ("Because causation is relative to the injury, a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case . . . .")). Although under *Althen* prong one a petitioner may have shown that the vaccine *can* cause the underlying condition, under prong two he or she must show that the vaccine *did* cause the condition in his or her specific case. *See Tripp*, 2025 WL 1158861, at *18 (citing *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1356 (Fed. Cir. 2006)).

Once again, the special master fully considered and gave due weight to Petitioner's medical records, as medical records are "generally viewed as particularly trustworthy evidence." *Id.* at *19 (citing *Cucuras*, 993 F.2d at 1528). For the reasons enumerated above, the special master found the Massachusetts General Hospital differential diagnosis of post-vaccine cerebellitis an insufficient basis on which to "conclude that there is preponderant evidence supporting a logical sequence of cause and effect implicating petitioner's flu vaccine as a cause of cerebellitis." *Id.* at *21.

On this prong, Petitioner challenges as irrational the special master's finding that the Massachusetts General Hospital diagnosis was not a definitive diagnosis. ECF No. 105 at 10–11. She emphasizes that the working diagnosis was reached by a "consensus" of the team of treating physicians, which she states the "Court should and must give significant weight to the opinions of not only one, but the consensus of multiple physicians." *Id.* at 11. She argues that because Respondent's expert agrees that the testing done by the hospital was "extensive," that Petitioner suffered severely in the period post-vaccination, and that "physicians 'obviously' cannot test for everything," the evidence presents a "close call" regarding the burden of proof on the second *Althen* prong, and that she must prevail because "the tie goes to the runner." *Id.* at 11; Oral Argument Recording at 13:28–14:22; *see also* ECF No. 105 at 8 (citing *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325–26 (Fed. Cir. 2006); *Althen*, 418 F.3d at 1280). However, when asked by the Court whether the special master indicated that this was a "close call," Petitioner admitted this "was not a tie" and the special master simply found that Petitioner did not meet her burden under the preponderance standard. Oral Argument Recording at 14:50–15:28.

The special master's finding that Petitioner did not meet her burden with respect to the second *Althen* prong was rational. Regarding the weight credited to the Massachusetts General

11

Hospital diagnosis, the special master thoroughly elaborated his reasoning, as discussed above. Importantly, the special master began his discussion by stating that the uncertainty of the diagnosis in this case was not dispositive, that "for the purposes of this decision [he] assume[s], but do[es] not decide, that petitioner suffered from acute cerebellitis." *Tripp*, 2025 WL 1158861, at *15. The special master explained that he found it unnecessary "to definitively resolve petitioner's diagnosis" and instead sought to examine, "based on the record of evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury." *Id.* (alteration in original) (quoting *Andreu ex rel. Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009)).

Nevertheless, the special master fully considered the Massachusetts General Hospital physicians' working diagnosis and viewed it within the context of the other differential diagnoses Petitioner received, which evolved with each hospital visit. *Tripp*, 2025 WL 1158861, at *5 ("Specifically, her treaters were considering 'the possibility of a transient autoimmune encephalitis related to the flu vaccine or the gastrointestinal illness that followed."); *id.* at *6 ("It was later noted that the relationship between petitioner's flu vaccination and 'the sudden appearance of symptoms the next day is unclear,' given that 'it takes about two weeks to mount an antibody response' to the flu vaccine."). Enumerating four reasons in his opinion, the special master properly concluded that without more, the Massachusetts General Hospital team's working diagnosis, that was "otherwise based primarily on a temporal relationship to vaccination," was insufficient proof to meet the second prong. *Id.* at *20.

In her motion for review, Petitioner overstates both the certainty with which the physicians diagnosed Petitioner and the process by which they came to their conclusions. Petitioner argues her "treating physicians at Mass. General determined that her cerebellitis was most likely the result of the vaccination," not citing to any part of the record. ECF No. 105 at 11. She also argues that these physicians "had multiple discussions about possible diagnoses and causation after 'extensive' testing and extensive consideration and reached a '**consensus**' on the diagnosis," again not citing to the record of those many discussions or that clear consensus. *Id.* (emphasis in original). The special master noted—as was discussed with respect to *Althen* prong one—"the records do not actually indicate a diagnosis of post-vaccine injury. Instead, under diagnoses, petitioner is listed as having a principal problem of 'cerebellar disease.'" *Tripp*, 2025 WL 1158861, at *19 (quoting ECF No. 5-1 at 26). He also noted that the records do "repeatedly refer to a 'post-vaccination cerebellitis' as a 'working diagnosis'" with the possibility of a "post-vaccinal etiology . . . merely being questioned." *Id.* Petitioner is correct that her imaging was reviewed at the neuroradiology rounds and, a consensus was reached that, among other things, the imaging "*may be* . . . consistent with the working diagnosis of a post-vaccination cerebellitis." ECF No. 5-1 at 26 (emphasis added). That said, she entirely mischaracterizes both the certainty with which the physicians reached their "working diagnosis" and the diagnosis itself.

Regardless, as the trier of fact, the special master generally has the authority to make "[d]eterminations of relative weight of different evidence." *Rogero v. Sec'y of Health & Hum. Servs.*, 748 Fed. App'x 996, 1001 (Fed. Cir. 2018) (citing *Moberly*, 592 F.3d at 1325–26); *see also Phillips v. Sec'y of Health & Hum. Servs.*, 988 F.2d 111, 111–12 (Fed. Cir. 1993) ("The special master serves as the trial forum, takes the evidence, considers the arguments of the

12

petitioner and the Government, and decides whether the evidence establishes that a compensable injury occurred."). The special master considered the evidence of Petitioner's working diagnosis and made his determination. Although the law demands that "close calls regarding causation are resolved in favor of injured claimants," *Althen*, 418 F.3d at 1280, Petitioner offers no evidence that this was a "close call," *see* Oral Argument Recording at 14:50–15:28, and the special master's decision makes plain that this simply was not a close call, *see Tripp*, 2025 WL 1158861, at *18–21. Petitioner again fails to meet her burden of proof of demonstrating that the special master's finding was irrational.

As with *Althen* prong one, the special master was under no obligation to continue his analysis upon finding that there was not "preponderant evidence supporting a logical sequence of cause and effect implicating petitioner's flu vaccine as a cause of cerebellitis." *Id.* at *21; *see Henkel*, 2024 WL 3873569, at *1; *W.C.*, 704 F.3d at 1358; *Dixon*, 61 Fed. Cl. at 8.

### 3. *Althen* Prong Three

Finally, the third *Althen* prong requires that a petitioner show by preponderant evidence a "proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278. This means putting forth "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, is medically acceptable to infer causation-in-fact." *de Bazan*, 539 F.3d at 1352.

Here, the special master analyzed the latter two *Althen* prongs together, observing a particular "catch-22" created by Petitioner's theory of onset. Two days after vaccination, Petitioner presented with nausea and vomiting, which could be symptoms of either infection or cerebellitis. *Tripp*, 2025 WL 1158861, at *20–21. The special master posited that if these were symptoms of cerebellitis, Petitioner might have a stronger case for causation (*Althen* prong two), but, according to Petitioner's own expert, timing of the onset would undermine there being a proximate temporal relationship (*Althen* prong three). *Id.* Conversely, if the nausea and vomiting were symptoms of a viral infection, this would undermine Petitioner's theory of causation (*Althen* prong two), but Petitioner's theory of timing for the onset of symptoms would endure (*Althen* prong three). *Id.* Regardless, the special master concluded that even if the nausea and vomiting were not neurologic, the causal relationship required under *Althen* prong two would be based only on the temporal relationship between vaccine and symptom onset, which is insufficient, unto itself, to meet Petitioner's burden. *Id.* at *21 (citing *Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 356 (2011)).

Petitioner asks the Court to set aside the special master's finding on this prong based on five sentences of her brief that are wholly unsupported by either citations to the record or case law. ECF No. 105 at 12. Petitioner argues that "[a]ll of her treating physicians believed there to be a close enough temporal relationship to the vaccination and the onset of her neurological symptoms to diagnose her with post-vaccinal cerebellitis." *Id.* The record does not bear this out, with several treating physicians specifically ruling out the possibility of post-vaccination cerebellitis. *See, e.g.*, ECF No. 21-1 at 6; ECF No. 14-1 at 45. Even with respect to just "all" of the treating physicians at Massachusetts General Hospital, her treating physician remarked that

13

she and several unspecified other physicians "reviewed her imaging at Neuroradiology rounds," during which they discussed possible differentials. ECF No. 5-1 at 26.

At oral argument, Petitioner clarified that she challenges the special master's application of the law, in that he incorrectly disallowed Petitioner from using evidence of one prong (presumably *Althen* prong two) to support another (here, *Althen* prong three). Oral Argument Recording at 17:50–18:17. Yet, the special master considered multiple configurations of the arguments she put forth on both *Althen* prongs two and three to determine whether either or both prongs were met, attempting to square the application of her theory of causation and the onset timing that would flow therefrom. *See Tripp*, 2025 WL 1158861, at *20–21. Petitioner cannot point to any specific error in the special master's examination of the relevant data or his articulation of his explanation for his denial. As such, the Court must uphold the special master's determination with respect to the third *Althen* prong.

## CONCLUSION

For the foregoing reasons, the Court finds that the special master adequately reviewed the record and articulated a satisfactory explanation, including a rational connection between the facts and conclusion, in his denial of entitlement. Therefore, his decision to deny entitlement was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the special master's decision denying entitlement is **AFFIRMED** and Petitioner's motion for review is **DENIED**. The pending motion for attorneys' fees is **REMANDED** to the special master. The Clerk shall enter **JUDGMENT** accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge
